PACHULSKI STANG ZIEHL & JONES LLP
James I. Stang, Esq. (admitted pro hac vice)
Kenneth H. Brown, Esq. (admitted pro hac vice)
Gail S. Greenwood, Esq. (admitted pro hac vice)
10100 Santa Monica, Boulevard, 11th Floor
Los Angeles, California 90067
Telephone:     (310) 277-6910
Facsimile:     (310) 201-0760
Email:         jstang@pszjlaw.com
               kbrown@psjzlaw.com
               ggreenwood@pszjlaw.com

-and-

Ilan D. Scharf, Esq.
Karen B. Dine, Esq.
Brittany M. Michael, Esq.
780 Third Avenue, 36th Floor
New York, New York 10017
Telephone:     (212) 561-7700
Facsimile:     (212) 561-7777
Email:         ischarf@pszjlaw.com
               kdine@pszjlaw.com
               bmichael@pszjlaw.com

Counsel for the Official Committee
of Unsecured Creditors of The Roman Catholic
Diocese of Rockville Centre, New York

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Case No. 20-12345 (MG) |
| | ) | |
| THE ROMAN CATHOLIC DIOCESE OF ROCKVILLE CENTRE, NEW YORK, | ) ) | Chapter 11 |
| | ) | |
| Debtor. | ) ) | |

|  |  |
|---|---|
| THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS,<br><br>      Plaintiff,<br> v.<br><br>CATHOLIC CEMETERIES OF THE ROMAN CATHOLIC DIOCESE OF ROCKVILLE CENTRE, INC., in Both Its Individual Capacity and as Trustee for the Diocese Of Rockville Centre Catholic Cemetery Permanent Maintenance Trust,<br><br>      Defendant. | Adv. No. _____ |

## COMPLAINT FOR AVOIDANCE AND RECOVERY OF FRAUDULENT TRANSFERS AND RECOVERY FOR UNJUST ENRICHMENT

The Official Committee of Unsecured Creditors (the "**Committee**") of The Roman Catholic Diocese of Rockville Centre, New York (the "**Diocese**" or the "**Debtor**") brings this adversary proceeding, on behalf of the Debtor's estate, against Catholic Cemeteries of the Roman Catholic Diocese of Rockville Centre, Inc. ("**CemCo**") in both its individual capacity and as trustee of the Diocese of Rockville Centre Catholic Cemetery Permanent Maintenance Trust (the "**Cemetery Trust**") pursuant to the authority granted to the Committee by the *Joint Stipulation and Order Concerning the Independent Advisory Committee and the Investigation and Pursuit of Certain Claims* entered May 14, 2021 [Docket No. 512] ("**Order Conferring Standing**").

### NATURE OF THE ACTION

1. In or about November 2016, in response to intensifying efforts to pass legislation to expand the statute of limitations for childhood sexual abuse claims ("**Sexual Abuse Claims**"), and in anticipation of significant lawsuits that would be filed against the Diocese, its parishes, and related entities, the Diocese commenced a massive asset protection scheme ("**Asset**

2

**Protection Scheme**") to put its assets beyond the reach of the survivors of childhood sex abuse ("**Survivors**")   The Asset Protection Scheme stripped the Debtor of its most valuable assets and involved the transfer of over $250 million worth of real property consisting of multiple cemeteries, a seminary, three high schools, and cash and financial assets to affiliated entities controlled by the Debtor.

2.      Prior to the transfers at issue, the Diocese held title to all of the associated real estate and financial assets of its cemeteries, which it operated through a department of the Diocese referred to as Catholic Cemeteries of the Diocese of Rockville Centre. The Diocese maintained standalone financial statements for the cemeteries that reflected the assets and liabilities associated with the cemeteries.  Catholic Cemeteries of the Diocese of Rockville Centre was not a separate legal entity, but rather was a part of the Diocese.

3.      This complaint seeks, among other things, to avoid and recover as fraudulent the Diocese's transfer of (a) the real and personal properties and business operations of four cemeteries to CemCo, (b) $40 million cash and investment assets to CemCo, and (c) approximately $65 million of investment assets to the Cemetery Trust (collectively, the "**Challenged Transfers**").  The fair market value of the Challenged Transfers, including the revenue-generating operations of the cemeteries, was over $200 million, but the Diocese only received, at most, $15,330,000 from CemCo in exchange for the assets.

4.      Resolution of the estate's fraudulent transfer claims against CemCo and the Cemetery Trust is a lynch pin of any reorganization by the Diocese because the determination of whether the transferred assets, or the value of the assets, are property of the estate will determine the magnitude of distributions to the Diocese's creditors, including the Survivors who have fought for years to hold the Diocese accountable for enabling childhood sexual abuse.

3

## JURISDICTION

5. This Court has jurisdiction over the adversary proceeding pursuant to 28 U.S.C. §§157(b)(1) and 1334, the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York* dated January 31, 2012, and Federal Rule of Bankruptcy Procedure 7001.

6. Venue in this judicial district is appropriate pursuant to 28 U.S.C. §1409.

7. This adversary proceeding constitutes a core proceeding pursuant to 28 U.S.C. §157(b)(2)(E), (H), and (O).

8. The Committee consents to entry of final orders or a final judgment by this Court in this adversary proceeding.

## PARTIES

9. On or about October 16, 2020, the United States Trustee for Region 2 appointed the Committee to represent the Diocese's unsecured creditors pursuant to 11 U.S.C. Title 11 (the "**Bankruptcy Code**") § 1102(a)(1) of the Bankruptcy Code. The Committee consists of nine individuals who hold claims against the Debtor, including eight Survivors abused by perpetrators for whom the Debtor was responsible and one representative of a minor with a civil rights claim against the Debtor.

10. The Diocese is a debtor and debtor-in-possession and continues to operate its business and remain in possession of its properties pursuant to Bankruptcy Code sections 1107(a) and 1108. No trustee or examiner has been appointed in the case.

11. CemCo is a New York nonprofit religious corporation whose principal place of business is located in Westbury, New York. CemCo is the sole trustee of the Cemetery Trust.

## FACTUAL BACKGROUND

**The Bankruptcy**

12. On September 30, 2020 (the "**Petition Date**"), the Diocese filed a voluntary petition for bankruptcy under chapter 11 of the Bankruptcy Code.

13. The Diocese commenced its bankruptcy in the wake of hundreds of lawsuits filed by Survivors under the Child Victims Act ("**CVA**") and in anticipation of additional claims against the Diocese and related entities for their complicity in, and derogation of duties with respect to, the persistent sexual abuse. The CVA modified the statute of limitations and created a one-year "window" during which victims of child sex abuse whose claim may have been time-barred may commence a timely civil action.[1] In addition, the CVA extended the statute of limitations for claims that were not time-barred on its date of passage, permitting such child victims to commence timely civil actions until they reach 55 years of age.

14. There are 498 state court actions pending against the Diocese and other defendants stemming from the sexual abuse of Survivors, all of which were subject to a consensual stay of litigation until early 2023. Approximately 747 proofs of claim have been filed against the Diocese for sexual abuse.

**CemCo and the Cemetery Trust were formed to facilitate the Asset Protection Scheme.**

15. In approximately June/July 2015, the Diocese sought and received approval from the Vatican to make certain extraordinary transfers in excess of the maximum amounts allowed under Canon Law to advance the Asset Protection Scheme. The Asset Protection Scheme in

---

[1] The CVA became effective on August 14, 2019 and the initial one-year window was scheduled to close on August 14, 2020, but was extended an additional year in response to the Covid-19 pandemic.

5

general, and the Challenged Transfers, in particular, discussed and defined below, was in response to (1) grand jury proceedings exposing a history of childhood sexual abuse by priests within the Diocese and potential liability for a vast number of Sexual Abuse Claims, (2) increasingly strident legislative efforts to expand the statute of limitations for Sexual Abuse Claims, and (3) multiple bankruptcies filed by other Catholic entities in response to an avalanche of litigation initiated by Survivors after the passage of similar legislation in other States, which had a significant negative impact on the financial condition of these entities.

16. In furtherance of the Asset Protection Scheme, on February 17, 2016, Bishop Francis Murphy established CemCo as a religious corporation to operate the cemeteries of the Diocese, receive certain Challenged Transfers, and place those assets out of the reach of the Diocese's creditors, including the Survivors.

17. Also in furtherance of the Asset Protection Scheme, on May 25, 2017, the Diocese, as settlor, created the Cemetery Trust, operated and overseen by CemCo, to receive the remaining Challenged Transfers and to place those assets out of the reach of creditors, including the Survivors. CemCo is the sole trustee of the Cemetery Trust.

18. The Cemetery Trust may be terminated at any time by CemCo at its sole discretion and the assets distributed to other tax-exempt Catholic organizations of CemCo's choosing,

19. CemCo and the Cemetery Trust were shell entities without assets until they received the Challenged Transfers, described below.

**The CemCo Transfers**

20. On September 1, 2017, the Diocese transferred to CemCo (the "**CemCo Transfers**") 462 acres of real property, associated personal property, the business operations of

6

four cemeteries, and $40,330,000 of cash and investment assets. The transfers involved the real property, assets, and operations of (a) Holy Rood Cemetery of Westbury, NY, (b) Holy Sepulchre Cemetery of Coram, NY, (c) Queen of All Saints Cemetery of Central Islip, NY,[2] and (d) real property slated for use as a cemetery in Old Westbury, NY (**"Old Westbury Property"** and collectively, the "**Cemeteries**"). The Diocese purportedly received $15,330,000 in consideration for the real property, which was paid from the transfer of cash and investments described below.

21. The transfer of the $40,330,000 of cash and investment assets was made pursuant to a Grant Agreement, which specified that CemCo shall have sole discretion over the use of the funds. A letter from the Diocese to CemCo of September 1, 2017 confirmed that the transfer was a gift from the Diocese to CemCo. Of this amount, and immediately following its receipt, CemCo transferred back to the Diocese $15,330,000 as purported consideration for the real properties associated with the Cemeteries.

### The Trust Transfer

22. On September 1, 2017, without consideration, the Diocese transferred (the "**Trust Transfer**") $65,000,000 of investment assets to CemCo, as trustee of the Cemetery Trust, consisting of (i) shares of the Vanguard Fund valued at approximately $60,900,000, and (ii) a fractional ownership of the Listerine Royalty Trust valued at approximately $4,100,000. The transferred assets were to be administered in accordance with the terms of the Cemetery Trust.

---

[2] Queen of All Saints Cemetery was subject to an exclusive option to purchase the real property by CemCo pending completion of a subdivision of the portion of property holding a cell tower. Although title to the real property was not transferred to CemCo, on information and belief, the Diocese and CemCo have treated the option agreement as having transferred title to the real property and all other assets and operations of Queen of All Saints Cemetery, consistent with the sale of the other three cemeteries.

7

23. The CemCo Transfers and the Trust Transfer (together the "**Challenged Transfers**") were made within six years of the Petition Date.

24. The Diocese held all legal and beneficial interests to all of the real and personal properties transferred prior to the Challenged Transfers and conducted the business operations of the Cemeteries.

25. The business operations of the Cemeteries were profitable at the time of the Challenged Transfers. Prior to the Challenged Transfers, the Cemeteries generated approximately $25.7 million in annual revenue for the Diocese, of which approximately $13.6 million was derived from operations and $10.9 million was attributable to gains on cash and investments. Financial statements of the Diocese reflect its receipt of annual contributions of approximately $3,250,000 from the operation of the Cemeteries, which ceased after the Challenged Transfers.

26. The fair market value of the Challenged Transfers at the time they were made exceeds $200 million dollars. Prior to the Challenged Transfers, in June 2017, the Diocese commissioned an independent valuation of the Cemetery operations *excluding* the real property slated for use in Old Westbury, NY. The study concluded that the enterprise value of just three of the Cemeteries as a combined operation was approximately $234 million, net of the perpetual maintenance liability.

27. In 2015, the vacant land in Old Westbury, NY that was transferred by the Diocese to CemCo was independently appraised and valued at $19,200,000.

28. The Diocese did not obtain fairness opinions or engage professionals to conduct a solvency analysis in connection with the Challenged Transfers.

**The Fraudulent Nature of the Challenged Transfers**

29.     The Asset Protection Scheme, in general, and the Challenged Transfers, in particular, were intended to strip the Diocese of assets and place those assets beyond the reach of the Survivors' claims and the claims of other creditors in the face of massive liability for Sexual Abuse Claims.

30.     The Asset Protection Scheme and Challenged Transfers exhibited multiple badges of fraud establishing the Diocese's actual intent to hinder, delay, or defraud its creditors, including the following:

    a.     The Challenged Transfers were made in exchange for less than adequate consideration to the Diocese. Specifically, the Diocese received no consideration for the CemCo Transfer in the amount of $40,330,000 and the Trust Transfer of $65,001,000. The Diocese received only $15,330,000 in consideration for the transfer of the Cemeteries' properties to CemCo.

    b.     The Challenged Transfers were to insiders of the Diocese: the Bishop of the Diocese is a shareholder/member of CemCo, a member of the Board of Directors of CemCo, and a person in control of both the Diocese and CemCo, and CemCo is the sole trustee of the Cemetery Trust. The Challenged Transfers were not arms-length transactions.

    c.     The Diocese retained the use, control, and benefit of the assets transferred to CemCo and the Cemetery Trust through its control of CemCo, in both its individual capacity and as trustee of the Cemetery Trust.

    d.     The Bishop, Vicar General of the Diocese, and an appointee of the Bishop constitute three of the five members of CemCo, and decisions subject to approval by the members of CemCo require a vote of either the Bishop or the Vicar General, and a majority vote

9

at a meeting at which a quorum is present. The Diocese retained further control of CemCo and the assets transferred because, in addition to being a shareholder/member, the Bishop is a full voting member of the Board of Directors of CemCo.

e. CemCo as sole trustee of the Cemetery Trust has sole discretion to use the trust funds for any Catholic charitable or religious purpose it chooses.

f. CemCo's corporate purpose and mission was to fulfill the obligations of the Diocese to the deceased under both civil and canon law and to provide for the current and future needs of the Diocese.

g. The Challenged Transfers were not made in the usual course of business.

h. The Diocese was subject to pending and threatened litigation at the time of the Challenged Transfers.

i. In January 2003, the Suffolk County Supreme Court Special Grand Jury issued a report pursuant to applicable criminal statutes, which described allegations of egregious sexual abuse of children at the hands of dozens of priests within the Diocese. The grand jury report included recommendations to amend or expand applicable statutes of limitation to permit civil lawsuits against the Diocese for Sexual Abuse Claims.

j. Between 2004 and 2019, the Diocese organized special lobbying groups to actively oppose the passage of legislation that would expand applicable statutes of limitations for Sexual Abuse Claims. During the same period, the Diocese actively monitored bankruptcies filed by Roman Catholic entities across the United Stated that resulted from Sexual Abuse Claims and the threat of litigation.

k. In June 2017, the Diocese became alarmed that legislation retroactively expanding the civil statute of limitations would enable Survivors to reach its assets and require

10

the Diocese to be held accountable for enabling decades of the sexual abuse of children. News articles confirm that the Diocese lobbied against the CVA and similar legislation, stating that it would "bankrupt" the church.

l.    The Asset Protection Scheme was a response to the concern that the enactment of the CVA would require assets to be used to satisfy the claims of Survivors. The Diocese's motive for the Asset Protection Scheme and the Challenged Transfers was place the assets of the Diocese beyond the reach of the Survivors and avoid the impact of the enactment of the CVA.

m.    Concurrent with the Diocese's effort to prevent or delay enactment of the CVA, the Diocese announced the establishment of its Independent Reconciliation and Compensation Program ("**IRCP**"), a voluntary program to financially compensate eligible victims of sexual abuse by Diocesan personnel in lieu of litigation, which was modeled after a similar program run by the Archdiocese of New York. Part of the Diocese's motive in launching the IRCP was to discourage the passage of the CVA by allowing Survivors whose claims were time barred to recover a capped amount, thereby allowing the Diocese to argue as part of its lobbying efforts that passage of the CVA was unnecessary.

n.    On information and belief, the Diocese spent millions of dollars on lobbying efforts to prevent the enactment of the CVA to protect its assets from the claims of the Survivors.

o.    The Challenged Transfers were approved by the Vatican in 2015, but the Diocese did not initiate the Challenged Transfers until two years later in September 2017, in the same calendar year as the other transfers by the Diocese of its high schools, seminary, cash, and investments that comprised the Asset Protection Scheme.

11

      p.      The Asset Protection Scheme and the Challenged Transfers collectively involved the transfer of most of the Diocese's financial and real estate assets.

      q.      The Asset Protection Scheme and Challenged Transfers were based on similar schemes implemented by other Catholic diocese within the United States, in response to escalating exposure to claims arising out of the sexual abuse of children and extended limitation periods for the Survivors to bring suit.

**Creditors of the Diocese as of the Petition Date**

31. Pursuant to Bankruptcy Code section 544(a) and the Order Conferring Standing, the Committee has, as of the Petition Date, all of the rights and powers of a "hypothetical judgment creditor" and may avoid any transfer of an interest in the Debtor's property that is voidable by such creditor without regard to the knowledge of any actual creditor as of the Petition Date.

32. In addition, pursuant to Bankruptcy Code section 544(b)(1) and the Order Conferring Standing, the Committee may avoid any transfer of an interest in the Debtor's property that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of the Bankruptcy Code.

33. Pursuant to New York Debtor & Creditor Law ("**NY DCL**")[3] section 270, a creditor is any person or entity that holds a right to payment, "whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured."

---

[3] NY DCL Article 10 (§§ 270 *et seq.*) was repealed effective April 4, 2020 ("Former NY DCL") and replaced by the Uniform Voidable Transactions Act. Pursuant to 2019 N.Y. AB 5622, section 7, the new act applies to a transfer made or obligation incurred on or after the April 4, 2020 effective date and does not apply to a transfer made or obligation incurred before such date. The Challenged Transfers were made prior to April 4, 2020 and are therefore governed by the former law. Accordingly, all references herein are to Former NY DCL.

34. On the date of the Challenged Transfers, the Diocese was obligated to both "present" and "future" creditors as those terms are used in the Former NY DCL. Each of these creditors hold unsecured claims that are allowable under Bankruptcy Code section 502.

35. In particular, certain Survivors held a right to sue the Diocese on the date of the Challenged Transfers, whose claim was not satisfied on the Petition Date (and has not been satisfied), who are therefore present creditors. Among the present creditors, certain Survivors initiated lawsuits against the Diocese prior to the Challenged Transfers, which lawsuits are or were still pending on the Petition Date, including the following:

    a. On January 21, 2015, a Survivor filed a lawsuit for damages entitled, *Kaitlyn Monaghan v. Roman Catholic Diocese of Rockville Centre, St. Francis of Assisi Parish, Father Gregory Yacyshyn, and Does 1-5*, Supreme Court of the State of New York, County of Nassau, case number 600406/2015. This action was pending on the Petition Date and stayed by the Diocese's bankruptcy.

    b. On April 25, 2016, a Survivor filed a lawsuit for damages entitled, *Sean Kiefabar v. Roman Catholic Diocese of Rockville Centre, St. Francis of Assisi Parish, and Does 1-5*, Supreme Court of the State of New York, County of Nassau, case number 602850/2016. This action was also pending on the Petition Date and stayed by the Diocese's bankruptcy.

36. In addition to the foregoing present creditors, hundreds of Survivors existed on the date of the Challenged Transfers who were present and/or future creditors of the Diocese.

**FIRST CLAIM FOR RELIEF**
**Avoidance and Recovery of Fraudulent Transfer**
**Against CemCo in Its Individual Capacity**
**(Bankruptcy Code §§ 544(b), 550, and Former NY DCL §§ 276, 276-a, 278-279)**

37. The Committee repeats and realleges the allegations contained in each preceding paragraph of this Complaint as though fully set forth herein.

13

38. The CemCo Transfers were fraudulent as to present and future creditors pursuant to Former NY DCL section 276 because the Diocese made the CemCo Transfers with intent to hinder, delay or defraud the Diocese's creditors, including, but not limited to, the Survivors who had (and still have) Sexual Abuse Claims against the Diocese.

39. CemCo is the initial transferee of the CemCo Transfers.

40. By reason of the foregoing, the Committee, on behalf of the Diocese's estate and for the benefit of unsecured creditors, is entitled to recover the CemCo Transfers or the value thereof pursuant to Bankruptcy Code section 550 and Former NY DCL sections 278 and 279.

41. In addition, the Committee is entitled to recover its reasonable attorneys' fees pursuant to Former NY DCL section 276-a because the CemCo Transfers were made by the Diocese and received by CemCo with actual intent to hinder, delay, or defraud the Diocese's creditors.

**SECOND CLAIM FOR RELIEF**
**Avoidance and Recovery of Fraudulent Transfer**
**Against CemCo in Its Individual Capacity**
**(Bankruptcy Code §§ 544(b), 550, and Former NY DCL §§ 273-275, 278-279)**

42. The Committee repeats and realleges the allegations contained in each preceding paragraph of this Complaint as though fully set forth herein.

43. The Diocese did not receive fair consideration in exchange for making the CemCo Transfers because CemCo only made a nominal payment of $15,330,000 – from cash transferred from the Diocese and returned to the Diocese – for assets worth over $200 million. Further, CemCo did not receive the CemCo Transfers in good faith as required for the existence of fair consideration under Former NY DCL section 272 because CemCo knew or should have known that the transfers were intended to shield the property from the reach of creditors.

44. The CemCo Transfers were fraudulent as to present creditors pursuant to Former NY DCL section 273 because they were made without fair consideration, and the Diocese was insolvent at the time of the CemCo Transfers or rendered insolvent as a result of the CemCo Transfers.

45. Alternatively, the CemCo Transfers were fraudulent as to present and future creditors pursuant to Former NY DCL section 274 because they were made without fair consideration when the Diocese was engaged in, or about to engage in, a business or transaction for which the remaining assets of the Diocese were unreasonably small capital.

46. Alternatively, the CemCo Transfers were fraudulent as to present and future creditors pursuant to Former NY DCL section 275 because they were made without fair consideration when the Diocese intended to incur, or believed that it would incur, debts beyond its ability to pay as they matured.

47. CemCo is the initial transferee of the CemCo Transfers.

48. By reason of the foregoing, the Committee, on behalf of the Diocese's estate and for the benefit of unsecured creditors, is entitled to recover the CemCo Transfers or the value thereof pursuant to Bankruptcy Code section 550 and Former NY DCL sections 278 and 279.

### THIRD CLAIM FOR RELIEF
### Avoidance and Recovery of Fraudulent Transfer
### Against CemCo in Its Capacity as Trustee of the Cemetery Trust
### (Bankruptcy Code §§ 544(b), 550, and Former NY DCL §§ 276, 276-a, 278-279)

49. The Committee repeats and realleges the allegations contained in each preceding paragraph of this Complaint as though fully set forth herein.

50. The Trust Transfer was fraudulent as to present and future creditors pursuant to Former NY DCL section 276 because the Diocese made the Trust Transfer with intent to hinder,

delay or defraud the Diocese's creditors, including, but not limited to, the Survivors who had (and still have) Sexual Abuse Claims against the Diocese.

51. CemCo is the initial transferee of the Trust Transfer in its capacity as trustee of the Cemetery Trust.

52. By reason of the foregoing, the Committee, on behalf of the Diocese's estate and for the benefit of unsecured creditors, is entitled to recover the Trust Transfer or the value thereof pursuant to Bankruptcy Code section 550 and Former NY DCL sections 278 and 279.

53. In addition, the Committee is entitled to recover its reasonable attorneys' fees pursuant to Former NY DCL section 276-a because the Trust Transfer were made by the Diocese and received by CemCo with actual intent to hinder, delay, or defraud the Diocese's creditors.

**FOURTH CLAIM FOR RELIEF**
**Avoidance and Recovery of Fraudulent Transfer**
**Against CemCo in Its Capacity as Trustee of the Cemetery Trust**
**(Bankruptcy Code §§ 544(b), 550, and Former NY DCL §§ 273-275, 278-279)**

54. The Committee repeats and realleges the allegations contained in each preceding paragraph of this Complaint as though fully set forth herein.

55. The Diocese did not receive fair consideration in exchange for making the Trust Transfer because it received nothing in exchange for $65,001,000 worth of investment assets it transferred to the Cemetery Trust. Further, CemCo did not receive the Trust Transfer in good faith as required for the existence of fair consideration under Former NY DCL section 272 because CemCo knew or should have known that the transfer was intended to shield the property from the reach of creditors.

56. The Trust Transfer was fraudulent as to present creditors pursuant to Former NY DCL section 273 because it was made without fair consideration, and the Diocese was insolvent at the time of the Trust Transfer or rendered insolvent as a result of the Trust Transfer.

16

57. Alternatively, the Trust Transfer was fraudulent as to present and future creditors pursuant to Former NY DCL section 274 because it was made without fair consideration when the Diocese was engaged in, or about to engage in, a business or transaction for which the remaining assets of the Diocese were unreasonably small capital.

58. Alternatively, the Trust Transfer was fraudulent as to present and future creditors pursuant to Former NY DCL section 275 because it was made without fair consideration when the Diocese intended to incur, or believed that it would incur, debts beyond its ability to pay as they matured.

59. CemCo is the initial transferee of the Trust Transfer in its capacity as trustee of the Cemetery Trust.

60. By reason of the foregoing, the Committee, on behalf of the Diocese's estate and for the benefit of unsecured creditors, is entitled to recover the Trust Transfer or the value thereof pursuant to Bankruptcy Code section 550 and Former NY DCL sections 278 and 279.

**FIFTH CLAIM FOR RELIEF**
**Unjust Enrichment**
**Against CemCo in Its Individual Capacity and as Trustee of the Cemetery Trust**

61. The Committee repeats and realleges the allegations contained in each preceding paragraph of this Complaint as though fully set forth herein.

62. The CemCo Transfers and the Trust Transfer caused CemCo and the Cemetery Trust to be enriched at the expense of the Diocese.

63. CemCo, in its individual capacity and as trustee of the Cemetery Trust, received substantial property and assets that in good conscience should be refunded to the Diocese's estate for the benefit of creditors. Based on equitable principles of restitution for unjust enrichment,

the Committee seeks a judgment against CemCo for restitution and disgorgement of the Challenged Transfers in an amount to be determined at trial.

**WHEREFORE,** the Committee prays for judgment as follows:

1. For a determination that the Challenged Transfers, individually and collectively, are avoidable as a fraudulent transfer pursuant to Bankruptcy Code section 544 and Former NY DCL sections 273-276;

2. For a determination that the Diocese's estate is entitled to recover, individually and collectively, the Challenged Transfers, or the value thereof, in an amount to be determined pursuant to section 550 of the Bankruptcy Code;

3. For attorneys' fees based on a proceeding to set aside a conveyance made with fraudulent intent pursuant to Former NY DCL section 276-a;

4. For a determination that the Diocese's estate is entitled to restitution for unjust enrichment in the amount of the Challenged Transfers according to proof;

5. For prejudgment interest; and

6. For such other and further relief as the Court may deem just and proper.

Dated:  May 26, 2023   PACHULSKI STANG ZIEHL & JONES LLP

*/s/ Kenneth H. Brown*
James I. Stang (*pro hac vice*)
Kenneth H. Brown (*pro hac vice*)
Gail S. Greenwood (*pro hac vice*)
10100 Santa Monica, Boulevard, 11th Floor
Los Angeles, California 90067
Telephone:    (310) 277-6910
Facsimile:     (310) 201-0760
E-mail: jstang@pszjlaw.com
          kbrown@pszjlaw.com
          ggreenwood@pszjlaw.com

-and-

Ilan D. Scharf, Esq.
Karen B. Dine, Esq.
Brittany M. Michael, Esq.
780 Third Avenue, 36th Floor
New York, New York 10017
Telephone:    (212) 561-7700
Facsimile:     (212) 561-7777
Email:          ischarf@pszjlaw.com
                  kdine@pszjlaw.com
                  bmichael@pszjlaw.com

Counsel for the Official Committee of Unsecured Creditors